Good morning, Your Honors. We are pleased to court. My name is Paula Olton. I represent Richard Brown. Your Honors, first of all, I'd like to reserve two minutes, if I may, for rebuttal. This appeal comes before the Court raising two primary issues. One pertains to the District Court's denial of Mr. Brown's motion to suppress evidence, and the second issue pertains to his sentencing. Addressing the first issue first, the motion in the – actually, this case really, in terms of the motion to suppress, is very fact-driven. This was a situation where the law enforcement officers came to Mr. Brown's co-defendant, Walter Martin's, residence. The purpose of their call was to seek and to check on the welfare of a young woman who they believed may have been kidnapped. When the police arrived, they divided into two teams, one to come to the front door and one – two officers to go around the back, theoretically for officer safety. Once the emergency was over, once the officers that went to the front door determined that the young woman was safe, the emergency, from our point of view, was over. The officers that – In the eyes of the officers in front. In the eyes of the officer in the front. And then, Your Honor, the officers in the front notified the officers in the back to come around. But that was the total – that was the total conversation or command. That's what the evidence shows, Your Honor, yes. That was the total message. And from our point of view, given the totality of the circumstances, that was aptly clear to the officers in the back that they were just to come forward, everything was well. The emergency has ended. But you haven't discussed the circumstances that were known to the officers that were in the back. The circumstances of the officers in the back were simply that they were coming to check on the welfare of the young woman. The reason that they were in the back was – were officer safety and security. There was nothing in the backyard that gave them any indication of insecurity. There was no evidence that there was any indication of criminal activity whatsoever. Did they hear something back there? They only heard something, Your Honors, on the way coming back through the yard when they violated the curtilage and the reasonable expectation of privacy that Mr. Brown had. That was when they found something. When they came through, they passed by the garage. Now, when they passed by the garage, the testimony is that what the officer heard was some noise. It could have been a radio or television. Certainly, completely innocuous, not any indication of criminal activity. Then, of course, the record reflects that they smelled the smell of ammonia. But, Your Honors, at that point, again, our position is that there was no reason for them to go further. There was no reason for them to stop and to continue to investigate. That they – What were they supposed to do then? Well, from our point of view, Your Honor, they should have just – they didn't even necessarily have to completely violate the curtilage by walking through the backyard. It was that complete – you know, going around and walking through the yard, meandering. I mean, there was – there were reasons for being there no longer. What were they supposed to do? They were supposed to – Well, one – one – one – Go around. One thing that we have is to just retrace their steps and go around – go around the way they came. Another option that they had was just to quickly make their way through and go to the front. Again, the emergency was over. And this was – Mr. Brown had a reasonable expectation of privacy in this area within the curtilage. Well, now, wherever they were – wherever they were when they received this message to come around – Yes. Up until then, you're complaining about no illegal search or illegal entry or anything. Am I right? Up until that point, when they received the radio communication, are you conceding that they were okay? Their initial approach to the house, we have no issue with. Including two officers going to the backside of the house. We take the position that it was not necessary for them to go back there, but we do understand officer safety. You're not expecting us to adjudicate that it was illegal. We would not expect the court to adjudicate that that portion was illegal. Up until the time they received the message. Up until the time that they received the message. And after they received the message, they were situated on this private property. That's correct. And the point is, at that point, and your contention is, they should have gotten off of that property, gone out onto the public way, and then come down the public way and gone back onto the property in front of the house. That's correct, Your Honors. That's your vision of the way they would do it lawfully. And your contention is that someplace between the time that they received the message and the time that one of them smelled the odor of ammonia, they did something illegal. What was illegal, Your Honor, was after they received the message. And before one of them smelled the ammonia. Yes. They took a few steps, or some steps, walking distance. Yes. Toward the front of the house. Yes. Taking a route that didn't take them off of the real estate that was owned by this private individual. That's correct, Your Honor. And that's the illegal part of it. Yes. That is. We believe that violates the Fourth Amendment. And we believe that that amounts to a warrant. For not having taken a different route off of the private property. Yes, Your Honor, I think so. I mean, we're not talking, Your Honor. I mean, when we look at the area, and the Court has the pictures in its record, this is a small area. I mean, this isn't a big area. There is no reason why the officers could not have turned around and come back the way that they came. And there was a short period of time here. I mean, we're talking minutes. Did they have any reason to believe that they were invading anybody's privacy by walking from wherever they were when they got the radio message to wherever they were going to go to get to the front of the house? There was nothing about anything that they had any reason to be even curious about, was there? Well, Your Honor, they knew that they were in the backyard. They knew that they were within this protected curtilage. They knew that. And the next step they were going to take, they would still be in the backyard until they got someplace, as you would argue, off. I'm sorry, Your Honor. I didn't mean to. Well, you say they should have gone off the same way they came on. Yes. And no other way. Correct. Okay. Now, then I would like to address the second issue here, and that is in terms of the sentencing. It's our position that this Mr. Brown's sentencing should be remanded back to the district court for resentencing. We believe that under several bases he would receive a substantially different result. First of all, the district court clearly understood that the sentencing guidelines at that point in time were mandatory. Mr. Brown's sentencing was first in three defendants, which is why we did not raise the issue of disparity at that point in time because Mr. Brown was sentenced first. When the other two defendants were sentenced, I think the numbers alone spell out how unreasonable Mr. Brown's sentence was. The one defendant, Mr. Gossett, was sentenced to 30 months. The second defendant, Mr. Martin, was sentenced to 78 months. And Mr. Brown was sentenced to more than twice Mr. Martin's sentence, and that is 168 months. He was sentenced under the higher end of the range of the at that point of the sentencing guidelines. There is no justification in the record for such a disparity in sentences. These are three defendants that worked together. Each one of them had a piece of the responsibility for this criminal activity. Mr. Brown sets out their various responsibilities very clearly in his plea agreement, and those are the facts to which he agrees to. When those facts are considered, each one of these defendants are very similarly situated and we believe should have similar sentences. Each one of them had a criminal history. Each one of them had serious substance abuse issues. And again, each one of them participated in this activity. Possibly we would say that Mr. Gossett of the three maybe had the least role if you want to characterize it that way. So at the very least, Mr. Brown should receive a sentence somewhere along the lines of Mr. Martin's sentence. Those two were dependent upon each other. Mr. Brown could not have done anything if he did not have the assistance of Mr. Martin. This was argued? Pardon me, Your Honor? This was argued to the district court? It was argued in a little bit different fashion, Your Honor, because again, Mr. Brown was sentenced first and we did not know what the sentences of the other co-defendants were going to be. But we were clear in terms of the plea agreement as to what the roles of the three were. Do you want a remand? Yes, Your Honor. We do. Thank you. Thank you. We'll give you a minute on rebuttal. Thank you, Your Honor. If you just do time. Good morning again. May it please the Court. I'm Bruce Meok. I'm representing the United States in this matter. There is no dispute, as this Court has pointed out, that the officers were lawfully present on the property in question investigating the welfare of a woman who they suspected may have been kidnapped by a man who was possibly armed with a gun. The only issue is whether it was improper for the deputy who was positioned at the back corner of the house, unaware that the alleged victim was okay, when told to come around, could walk that short distance towards the garage. I mean, that is really the only issue because that is the illegal activity in which the defendant is arguing violated his right to privacy. It does come down, essentially, to the route taken, and there is nothing that was improper about this officer to simply walk across the back of the house, regardless of whether she knew that the emergency had dissipated or not, when she's told to come around. Do you agree with the district court that, after the officer heard the command, that the officers didn't proceed through the curtilage? Do I agree with that? Yes. That's what we argued at the district court, and I do stand by that argument. You're saying that the person's backyard, whether it has a fence or does not have a fence, is not the curtilage for the house? It's not just the fence, Your Honor. I think based upon these facts, given the fact that there was no enclosure, given the fact that it was openly visible from the neighbors to the south and to people passing by, it was a highly traveled road in which anybody passing by in car or foot could easily look into that backyard. That's the nature of urban residential property, isn't it? That's true. And if you're correct, the person has very little privacy if they live in town and have a backyard, right?  Okay. Either from the neighbors or the police. But even if this Court were to find that this was curtilage, the issue is the officers were lawfully present, and they were worthy and entitled to walk across that backyard under these circumstances, even if it was curtilage. And I don't believe that this panel even needs to get to the issue of curtilage to resolve this issue. What's the better argument? I think the better argument is the fact that the officer did not violate this defendant's right to privacy. They were there pursuant to the emergency doctrine, and that the district court properly focused on the state of mind of the deputy who was standing at that back corner. And I would point the Court to the excerpts of records and photographs just to show the scenario. The officer is standing right at this corner. And the two officers go to the front, and she doesn't know what's happening inside. She doesn't hear what they're saying. She doesn't see who they're talking to. The only thing she gets after a few minutes is come around. At that point, if she testified and the district court found credible, she didn't know that Ms. Gonzalez had been found and was okay. Now, you combine that with what she hears, she's in a heightened state of alert. It's a potentially very dangerous situation. She looks across the yard and sees this garage. As you can see, it's covered with a tarp on the front. And what she sees is this side of the garage. And what she testified to, she was able to see that the window was blacked out and the door was padlocked. And she begins to hear some noises. She couldn't distinguish exactly what it was. She thought it might be movement in the garage. It could possibly even be a TV on it. But given what she was there for, she also thought that reasonably that it could be someone who was being hidden in that garage. So she's very concerned. And as soon as she's told to come around, she immediately walks over there because of that concern. And I think that under these circumstances, that that was appropriate. And when you evaluate this from the standpoint of that officer, standing in that officer's shoes, as this Court has stated that we should. The district court – did the district court find that the conduct was reasonable because of emergency or exigent circumstances? Yes. The district court found that based – standing that – I thought it found that there was no violation of the curtilage. Well, the district court also found that. It found both. It found both the emergency and it also found that this was not a violation of the curtilage as well. But as I indicated, the better argument, and I don't think the Court even needs to decide the issue of curtilage, is that this officer's actions were reasonable under the emergency doctrine. Now, regarding – that's really all I have on that particular issue because I think it does rise or fall, truthfully, on two things. The route she took as well as her state of mind and the district court's finding that she did not know that the emergency had dissipated. That's somewhat broader than what the Court actually found. But that she didn't know that the victim had been found is not clearly erroneous. Lastly, as far as sentencing, it's true that Mr. Brown was sentenced first, but the district court – I think when you examine the record, the record is sufficiently clear that the district court viewed Mr. Brown as the most culpable because he was the person who had a history of being involved in manufacturing meth. He was the cook. He was the person who actually was instrumental in setting up the lab. And what the Court said was, I'm a judge who normally starts at the low end of the guideline range, and then went through his history, decided to give him the high end of the range. I think when you examine that, it's sufficiently clear that even if this matter was remanded, that he would receive the same sentence. And I might add that given the time when Mr. Brown was sentenced, it was still when Amelie had not been decided, nor had Booker for that matter, and we were unsure of what was going to happen. So he received the benefit of only being held to what he admitted to, which was 50 grams or more of pure methamphetamine. When the police, when they investigated this lab, they found a large amount of binder material, and based upon that, it was calculated that this lab had produced at least 20 pounds of pure methamphetamine. His guideline range, if the guidelines had applied, was 292 to 360 months. So I think it's pretty clear that he would not receive a better sentence if he, if this matter was remanded. That's all I know. Well, the appellant has asked for a remand, I take it. You, okay. I would simply say if this Court feels that it's, the record is insufficient, then under Amelie, this matter gets sent back for a limited remand. From what you've argued, the Court might enhance the sentence. That is very possible. So the risk is his, not yours. The risk is his. Okay. The only thing is the district court did leave a lot of slack toward the upper end, did it not? Did it go precisely to the top? The district court did go to the top. Precisely to the top. Of 168 months, yes. Okay. Of the then applicable range. Okay. Thank you. I think the Court hit the issue right in the head. The district court was in error when it concluded that the police officer did not proceed through the curtilage. And when the area, the suburban area is taken into consideration, as Your Honor pointed out, the issue of privacy is very difficult. And the other part of this is this was rental property. So how much control Mr. Martin and Mr. Brown had over protecting and building a fence was very limited. They had not lived there very long. There is no, under any of those pictures, it is clear this was a backyard. It is clear this was curtilage. Okay. And on the issue of the sentencing, Mr. Brown could not have, Mr. Brown admitted that there was 50 grams or more of methamphetamine. The government could not have countered that because the government no longer had the evidence, no longer had the drugs. One final issue, Your Honor, Mr. Brown has submitted his own supplemental brief on the issue of speedy trial. And I would ask the Court on his behalf to examine that issue closely. Thank you. Thank you, counsel. Before case is argued and submitted and before hearing the last case in order to do our electronic hookup, the Court will take a five-minute recess.
judges: Schroeder, Alarcon, Leavy